# IN THE IOWA DISTRICT COURT FOR DELAWARE COUNTY

## Case Number: LACV008683

FARMERS SAVINGS BANK; MARK WHITE; )
and MICHAEL FUNKE )       ACCEPTANCE OF SERVICE
Plaintiff(s), )
  )
  )
v. )
  )
  )
AMTRUST NORTH AMERICA and WESCO )
INSURANCE COMPANY, )
Defendant(s), )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )
  )

---

Service of the foregoing, ORIGINAL NOTICE, PETITION ET AL, is hereby accepted as provided by the law for the WESCO INSURANCE COMPANY, defendant named herein, the 12th of February, 2020.

Commissioner of Insurance

Doug Ommen

EXHIBIT

1

## IN THE IOWA DISTRICT COURT IN AND FOR DELAWARE COUNTY

| | |
|---|---|
| FARMERS SAVINGS BANK; MARK WHITE; and MICHAEL FUNKE, | Case No. |
| Plaintiffs, | **ORIGINAL NOTICE** |
| vs. | |
| AMTRUST NORTH AMERICA AND WESCO INSURANCE COMPANY, | |
| Defendants. | |

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby notified that a Petition has been filed in the office of the Clerk of this Court naming you as the Defendants in this action, a copy of which Petition is attached to this Notice. The names and address of the attorneys for the Plaintiffs are Matthew L. Preston and Cara L. Roberts, Brady Preston Gronlund PC, 2735 First Avenue SE, Cedar Rapids, IA 52402. The attorneys' telephone number is 319-866-9277; facsimile number 319-866-9280.

You must serve a Motion or Answer within 20 days after service of this Original Notice upon you and, within a reasonable time thereafter, file your Motion or Answer with the Clerk of Court for Delaware County, at the county courthouse in Manchester, Iowa. If you do not, judgment by default may be rendered against you for the relief demanded in the Petition.

This case has been filed in a county that uses electronic filing. You must register to efile through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a login and password for the purposes of filing and viewing documents in your case and for receiving service and notices from the Court.

For general rules and information on electronic filing, refer to the Iowa Court Rules Chapter 16 Pertaining to the Use of the Electronic Document Management System, available on the Iowa Judicial Branch website. For Court rules on the Protection of Personal Privacy in Court filings, refer to Division VI of Iowa Court Rules Chapter 16. If you are unable to proceed electronically, you must receive permission from the Court to file in paper. Contact the Clerk of Court in the county where the Petition was filed for more information on being excused from electronic filing.

If you need assistance to participate in court due to a disability, call the disability coordinator at (319) 398-3920. Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). **Disability coordinators cannot provide legal service.**

**IMPORTANT:** YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS.

1

# STATE OF IOWA JUDICIARY

*Case No.* LACV008683

*County* Delaware

*Case Title* FSB ET AL VS AMTRUST ET AL

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(319) 833-3332**  . (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942.**)

*Date Issued*  02/06/2020 09:22:21 AM



*District Clerk of* Delaware          *County*

/s/ Linda Harvey

IN THE IOWA DISTRICT COURT IN AND FOR DELAWARE COUNTY

| | |
|---|---|
| FARMERS SAVINGS BANK, MARK E. WHITE, and MICHAEL J. FUNKE, | No. LACV_____ |
| Plaintiffs, | **PETITION AT LAW** |
| vs. | |
| AMTRUST NORTH AMERICA, INC. and WESCO INSURANCE COMPANY, | |
| Defendants. | |

Plaintiffs, Farmers Saving Bank, Mark E. White, and Michael J. Funke, for their Petition at Law against Defendants, AmTrust North America, Inc. and Wesco Insurance Company, state:

## THE PARTIES

1. Plaintiff Farmers Savings Bank ("FSB") is an Iowa banking corporation, which is headquartered in Colesburg, Delaware County, Iowa.

2. Plaintiff Mark E. White ("White") is a citizen and resident of Iowa and was (and remains) employed by and served as a Director and President of FSB during all relevant times in this matter.

3. Plaintiff Michael J. Funke ("Funke") is a citizen and resident of Iowa and was (and remains) employed by and served as a loan officer and Senior Vice President of FSB during all relevant times in this matter.

4. AmTrust North America, Inc. ("AmTrust") does business in and writes policies of insurance in the state of Iowa. AmTrust is incorporated under the laws of the state of Delaware and has its home office in New York, New York.

5.    Wesco Insurance Company ("Wesco") does business in and writes policies of insurance in the state of Iowa. Wesco is incorporated under the laws of the state of Delaware and has its home office in New York, New York.

6.    Upon information and belief, AmTrust issues insurance policies through subsidiaries, such as Wesco, and AmTrust makes coverage determinations on behalf of itself and those subsidiaries, such as Wesco.

## GENERAL ALLEGATIONS

### Jodene Puff's History with Plaintiffs

7.    Jodene Puff's ("Puff") banking relationship with FSB began in or around 2005, when FSB issued the first of multiple loans to Puff which were secured by various properties and equipment. Funke was the primary loan officer from FSB that worked with Puff throughout the duration of FSB's lending relationship with Puff. White was the President of FSB throughout the duration of FSB's lending relationship with Puff.

8.    By May 2012, Puff had been in default on various loans with FSB since 2009 and in a significant amount.

9.    Puff filed for Chapter 11 bankruptcy in 2012 but was not able to obtain court approval of her reorganization plan, at which time FSB and Puff reached a settlement (the "Settlement"), which included Puff's voluntary dismissal of her bankruptcy Petition, an Agreement of Voluntary Foreclosure and updated arrangements for addressing Puff's outstanding amounts owed. The Agreement for Voluntary Foreclosure included a full release of FSB and FSB's employees by Puff from any claims arising from all matters occurring on or before June 27, 2012. Even after the Settlement, Puff could not satisfy her obligations to FSB, which ultimately led to Puff's eviction from the property securing her loans.

2

10.     Before and after the Settlement, Puff exchanged a great deal of correspondence and communications with FSB and Funke, directly and through their counsel. The scope of these communications included regular business communications about Puff's loans, a range of proposals from Puff regarding arrangements that she purported would address deficiencies and defaults, various complaints about her situation, requests for Funke and FSB to return property and/or money to her, and more.

11.     The tone of the communications, which FSB understood to include threats by Puff, became strained to the point that in 2013, FSB's attorney sent correspondence to Puff's counsel requesting that all communications from and on behalf of Puff should only be sent to FSB's attorney and not directly to any FSB employees.

12.     In 2016, Puff's newest attorney sent a letter addressed to White at FSB. A copy of the August 29, 2016 letter from Puff's counsel (the "Puff Letter") is attached to this Petition as *Exhibit A*. The Puff Letter makes allegations concerning Puff's history with FSB and Funke, including allegations certain banking regulations had been violated, without specifically identifying any purported facts that allegedly violated any of the listed regulations. Similarly, although the Puff Letter infers that actions of FSB and Funke were wrongful, the Puff Letter fails to specifically identify any purported facts or actions as wrongful. The Puff Letter ends by offering "FSB the opportunity to discuss and resolve these matters, and to provide Ms. Puff restitution."

13.     Puff also signed and sent letters almost identical to the Puff Letter to the Federal Deposit Insurance Corporation ("FDIC"), Consumer Financial Protection Bureau and the Iowa Division of Banking. Puff's version of the letter sent to these regulators included a request for "restitution due to the significant loss of income, assets, and time."

3

14.     FSB recognized the Puff Letter and letters to regulators as a continuation of Puff's attempts to regain loan-related money and property. FSB's counsel responded to the Puff Letter (the "October 2016 Response") by acknowledging, in relevant part, that Puff signed a Release relating to any FSB actions taken before June 27, 2012 and that the information in the Puff Letter merely reflects Puff's history of failing to meet her obligations to FSB and Funke's consistent efforts to ensure that the bank's position remained as secure as possible.

15.     As a result of Puff's letter to the FDIC, the FDIC made an inquiry into Puff's allegations and ultimately took no action and found no misconduct by FSB.

16.     FSB then heard nothing more from Puff or her counsel until the June 2018 Petition filed by Puff (the "Puff Petition" attached to this Petition as *Exhibit B*), which named FSB, White and Funke as Defendants.  The Puff Petition alleged that essentially all actions taken by FSB and Funke violated Iowa's Mandatory Agricultural Mediation Law, breached written and oral contracts with Puff, defrauded Puff, breached a fiduciary duty to Puff and resulted in unjust enrichment. The Puff Petition identified new legal claims and purported facts not claimed in the Puff Letter. The Puff Petition sought monetary damages in addition to restitution from Plaintiffs.

### AmTrust's Wrongful Denial of Coverage

17.     AmTrust, through subsidiary companies (as described below), insured Plaintiffs against various types of professional liability, including between September 14, 2013 and September 14, 2019.  Between the time period of September 14, 2013 to September 14, 2016, AmTrust insured Plaintiffs under a policy issued by its subsidiary Security National Insurance Company ("Security National"), Policy No. SDO110324602 ("the Security National Policy" attached to this Petition as *Exhibit C*).

4

18.     AmTrust insured Plaintiffs through its subsidiary Wesco for the time period September 14, 2016 to September 14, 2019.

19.     AmTrust's policy, through its subsidiary Wesco, was under a claims-made Commercial Policy No. WD01498490 00 (the "Wesco Policy") issued to FSB for the Policy Period of September 14, 2016 to September 14, 2019 (the "Wesco Policy Period"). A copy of the Wesco Policy is attached to this Petition as *Exhibit D*.

20.     Operative language from the Security National Policy reads as follows:

    B.    **Claim** means:
1. a written demand for monetary damages or non-monetary relief, including notice of an arbitration, mediation or other dispute resolution proceeding in which money damages are sought;
2. a civil proceeding commenced by the service of a complaint or similar pleading;
3. an administrative or regulatory proceeding commenced by the filing of a notice of charges or similar pleading; or
4. a criminal proceeding commenced by a return of an indictment.

A **claim** shall be deemed to have been made on the date the **company** or an **insured person** receives the written demand, or on the date that the judicial or administrative proceeding is filed in court or with an administrative agency.

All **claims** involving **interrelated wrongful acts** shall be considered a single **claim** and shall be deemed to have been first made when the earliest **claim** was first made.

    Q.    **Interrelated wrongful acts** means **wrongful acts** that have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

    GG.    **Wrongful act** means **company wrongful act, electronic banking wrongful act, electronic publishing wrongful act, employment practices wrongful act, fiduciary wrongful act, harassment wrongful act, IRA/Keogh/Health Savings Account wrongful act, lending wrongful act, management practices wrongful act, professional services wrongful act, and trust department wrongful act.** (Emphasis in original.)

5

21. Operative language from the Wesco Policy includes as follows:

**Claim** has the meaning set forth in the applicable **Coverage Part.**

**Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

**Claim** means:
1. a written demand, other than a **Shareholder Derivative Demand**, for monetary damages or non-monetary relief;
2. a civil proceeding commenced by the service of a complaint or similar pleading;
3. a criminal proceeding commenced by a filing of charges or the return of an indictment;
4. a formal administrative or regulatory proceeding commenced by a filing of a notice of charges, formal investigative order, service of summons, or similar document;
5. an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld;
6. service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal investigative order by the Securities and Exchange Commission;
7. a **Shareholder Derivative Demand** solely with respect to Insuring Agreement C.2. only; or
8. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding, against an **Insured** for a **Wrongful Act. Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement. (Emphasis in original.)

22. Plaintiff FSB is a Company[1], as defined by the Wesco Policy. Plaintiffs White and Funke are Insured Persons, as defined by the Wesco Policy. As such, all three Plaintiffs are Insureds, as defined by the Wesco Policy.

---

[1] The Wesco Policy identifies defined terms by capitalizing the terms and using bold type. When quoting Wesco Policy provisions, this Petition maintains the emphasis provided in the Wesco Policy. Otherwise, this Petition references defined Wesco Policy terms by capitalizing those terms.

23. FSB tendered the Puff Petition to AmTrust seeking coverage on behalf of FSB, White and Funke under the Directors and Officers Coverage Part of the Wesco Policy.

24. In a letter dated October 5, 2018 ("Denial Letter"), Defendant AmTrust denied coverage to Plaintiffs. The Denial Letter denies coverage under and focuses on the terms of the Security National Policy which was in effect at the time the Puff Letter was received, rather than properly relying on the terms of the Wesco Policy that was in effect at the time of the Puff Petition.

25. AmTrust denied coverage to Plaintiffs asserting that the Puff Letter dated August 29, 2016 represented a claim made under the Security National Policy, and that such claim was not timely submitted to AmTrust. AmTrust asserts that the Puff Petition, filed in July 2018, which was submitted to AmTrust shortly after its filing, contained Interrelated Wrongful Acts with those described in the Puff Letter. AmTrust asserted the Puff Letter qualified as a "Claim" first made under the term of the Security National Policy but was not timely submitted under that policy, and because the "Claim" pre-dated the Wesco Policy, Plaintiffs also did not have coverage under that policy.

26. AmTrust's Denial Letter states in relevant part as follows:

> The August 29, 2016 demand letter was issued during the Security National Policy Period (and prior to the Wesco Policy being issued), and constitutes a Claim under the Security National Policy. The Security National Policy defines a "Claim" to include a "written demand for monetary damages or non-monetary relief." The August 29, 2016 demand letter was addressed to White and references FSB making restitution for the damages suffered by Puff, as well as threatened legal action going forward. It also requests a litigation hold on certain documents, which necessarily involves anticipated litigation.

> The Security National Policy's definition of Claim also states:

>> All **claims** involving **interrelated wrongful acts** shall be considered a single **claim** and shall be deemed to have been first made when the earliest **claim** was first made.

7

Interrelated Wrongful Acts are defined as:

> [W]rongful acts that have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

The August 29, 2016 demand letter and the Complaint filed in July 2018 allege Interrelated Wrongful Acts. They make the same allegations regarding the same loan transactions, bankruptcy, and foreclosure proceedings. Therefore, all of the Puff-related allegations should be treated as a single Claim first made on August 29, 2016, which is prior to the inception of the Wesco Policy thereby precluding coverage under the Wesco Policy and requires further analysis of coverage under the Security National Policy. (Emphasis in original.)

27. Although not cited in the Denial Letter by AmTrust, the relevant language of the Wesco Policy includes the following language:

a. Section I (Insuring Agreements) of the Directors and Officers Liability Coverage Part of Wesco Policy which provides, in relevant part, the following insuring agreements:

> **A.** **INSURED PERSONS LIABILITY COVERAGE** - The **Insurer** will pay on behalf of the **Insured Persons, Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for any **Wrongful Act,** except for **Loss** the **Company** pays as indemnification.

> **B.** **COMPANY INDEMNIFICATION COVERAGE** - The **Insurer** will pay on behalf of the **Company, Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for which the **Company** has agreed to or is legally permitted or required by law to indemnify the **Insured Persons** for any **Wrongful Act.**

> **C.** **COMPANY LIABILITY COVERAGE** - The **Insurer** will pay on behalf of the **Company:**

> 1. **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Company** for any **Wrongful Act** not covered in any other **Coverage Part** made part of this **Policy.** (Emphasis in original.)

8

     b.     Section III (Limits of Liability and Retention) of the Wesco Policy provides,

in relevant part, the following:

> C. **SINGLE LIMIT /RETENTION** - **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim,** and only one Retention and Limit of Liability shall apply. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period.** (Emphasis in original.)

     c.     Section IV (Definitions) of the Directors and Officers Liability Coverage Part of

the Wesco Policy provides, in relevant part, the following definitions:

> **Claim** means:
> 1. a written demand . . . for monetary damages or nonmonetary relief [or]
> 2. a civil proceeding commenced by the service of a complaint or similar pleading . . .
> against an **Insured** for a **Wrongful Act**.
>
> **Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.
>
> **Loss** means **Defense Expenses** and any amount the Insured is legally obligated to pay resulting from a **Claim**, including damages .... **Loss** shall not include: ...any restitution.
>
> **Wrongful Act** means any actual or alleged:
> 1. error, omission, misstatement, misleading statement, neglect or breach of duty by **Insured Persons** in their capacity as such or, with respect to Insuring Agreement C., by the **Company;** or
> 2. matter claimed against the **Insured Persons** solely by reason of their serving in such capacity. (Emphasis in original.)

     d.     Section V (Notice of Claims and Potential Claims) of the Wesco Policy provides,
in relevant part, as follows:

> **NOTICE OF CLAIMS** - The **Insured** shall, as a condition precedent to their rights under this **Policy,** give the **Insurer** written

9

notice as soon as practicable, of any **Claim** made and brought to the attention of an **Executive,** but in no event later than ninety (90) days after the expiration of the **Policy Period** in which the **Claim** was first made or the expiration of the **Policy Period.** (Emphasis in original.)

28.    AmTrust incorrectly analyzed Plaintiffs' tendering of coverage almost entirely under the Security National Policy rather than under the Wesco Policy, as it should have given that the Puff Petition was filed and submitted during the term of coverage under the Wesco Policy.

29.    In addition, AmTrust's Denial Letter relied upon boilerplate language and concepts in the Security National Policy, and entirely ignored the specifically negotiated provisions in the Wesco Policy (and as would be true of the Security National Policy as well), as they related to Plaintiffs, that entirely negate AmTrust's analysis and denial.

30.    Plaintiffs' Application[2] that gave rise to the Wesco Policy, together with terms of the Declaration Page and Exclusions of that Wesco Policy, conflict with the boilerplate definitions and provisions relied on by AmTrust in its Denial Letter. The specifically negotiated and typewritten terms found in the Application, Declarations Page, together with the language of the operative Exclusions, that are part of the Wesco Policy, modify or are in conflict with the boilerplate language relied on by AmTrust as found elsewhere in the Wesco Policy, and those specific typewritten terms must be given greater effect, or at a minimum recognized as creating an ambiguity to be interpreted in the insured-Plaintiffs' favor.

31.    The following quoted language from the Wesco Policy makes clear that the Application is a fully integrated part of the insurance policy and specifically defined as the "Policy."

---

[2] Plaintiffs' Application for Insurance ("Application") with AmTrust, signed August 25, 2016 is attached hereto as *Exhibit E.*

10

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations Page and **Application,** the **Insurer** and the **Insureds** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy,** as follows:

**Policy** means, collectively, the Declarations Page, the **Application,** the General Terms and Conditions Applicable to All Coverage Parts, each **Coverage Part** purchased, and any Endorsements attached thereto.

It is agreed and represented that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy.**

By acceptance of this **Policy,** the **Insured** and the **Insurer** agree that this **Policy,** the **Application,** and any written endorsements attached thereto constitute the entire agreement between the parties. Assignment of interest under this **Policy** shall not bind the **Insurer** until its consent is endorsed hereon.

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations Page and **Application,** the **Insurer** and the **Insureds** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy,** as follows:

Each Coverage Part has the same references to "Application" as the above-quoted

provisions in Directors & Officers Liability Coverage Part.

32.    Application Section IX – "D&O/E & O Pending Litigation and Claims History",

specifically adapted to Plaintiffs by virtue of the six boxes to be checked yes or no, represents

specifically negotiated type-written (check-the-box) contractual language which must govern over

conflicting boilerplate language found elsewhere in the policy.

33.    Application Section IX, which is part of the Wesco Policy as described above,

clearly differentiates the effect of an existing or potential "claim", on a new applicant versus a

renewal applicant. That Application Section provides new applicants will not have coverage for

matters that have been the subject of a prior demand (which is exactly what AmTrust's Denial

Letter is based on). Renewal applicants (which Plaintiffs were) are not subject to the same lack of

coverage. Instead, Application Section IX only asks renewal applicants if they are subject to a

11

pending and financially material lawsuit, and states that for known potential claims, renewal applicants are subject to the limits of insurance found in the expiring policy and not increased limits.

34. The basis for denial relied on by AmTrust that the Puff Letter qualified as a Claim first made before the Wesco Policy and thus no coverage is afforded Plaintiffs under the Wesco Policy, is a denial basis that AmTrust relinquished in the Application Section IX by limiting that exact basis for denial of coverage, to new applicants, but not for renewal applicants such as Plaintiffs.

35. The Declarations Page at Item 5 also contains specifically negotiated and type-written provisions regarding the pending and prior litigation date of September 14, 2012, as well as marking N/A for the retroactive coverage date under Item 5 which, in turn, is incorporated into the Wesco Policy and is relevant in determining whether an item that has been arguably the subject of a previous claim will result in coverage being excluded.

36. The Exclusions section, the D & O Coverage Part, expressly deals with prior acts and knowledge. Operative language from the exclusions includes as follows:

> **Past Acts** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any actual or alleged **Wrongful Acts** committed on or before the Retroactive Date set forth in Item 5.(b) of the Declarations Page or any **Wrongful Acts** occurring prior to such date which together with **Wrongful Acts** occurring on or after such date would constitute **Interrelated Wrongful Act.**

> **Prior Knowledge/Litigation** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

> 1. any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive** had knowledge prior to the date of the initial **Application** for coverage; or

12

2.     any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to the applicable Prior and Pending Litigation Date(s) set forth in Item 5.(a) of the Declarations Page, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

**<u>Prior Notice</u>** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

37.     The combination of Item 5 of the Declarations Page, with the operative Exclusions, such as those quoted above, reflects Plaintiffs and Defendants' specifically negotiated agreement as to what circumstances will lead to a denial of coverage for a matter that is arguably related to an earlier claim, demand, or event. That specifically negotiated and typewritten (in the form of Item 5) language must supersede any conflicting boilerplate language (such as the definition of Interrelated Wrongful Acts or Interrelated Claims found in the boilerplate general terms and conditions of the Wesco Policy. As an alternative, the combination of Item 5 of the Declarations Page, with the operative Exclusions, such as those quoted above, consisting of specifically negotiated and typewritten language, provides a superior reflection of the intent of Plaintiffs and Defendants and must be enforced over any conflicting boilerplate language (such as the definition of Interrelated Wrongful Acts or Interrelated Claims found in the boilerplate general terms and conditions of the Wesco Policy). Finally, as a further alternative, there is at a minimum an ambiguity created by the conflict between the specifically negotiated and typewritten (in the form of Item 5 of the Declarations Page) language together with the operative Exclusions such as those quoted above, conflicting with the boilerplate language (such as definition of Interrelated

13

Wrongful Acts or Interrelated Claims found in the boilerplate general terms and conditions of the Wesco Policy).

38.     AmTrust's entire denial under the Wesco Policy was set out in its Denial Letter with the language:

> The August 29, 2016 demand letter and the Complaint filed in July 2018 allege Interrelated Wrongful Acts.  They make the same allegations regarding the same loan transactions, bankruptcy, and foreclosure proceedings.  Therefore, all of the Puff-related allegations should be treated as a single Claim first made on August 29, 2016, which is prior to the inception of the Wesco Policy thereby precluding coverage under the Wesco Policy and requires further analysis of coverage under the Security National Policy. (Emphasis in original.)

39.     The basis for denial above is drawn entirely from boilerplate language found in the general terms and conditions of the Wesco Policy, which terms were however specifically modified by Item 5(a) of the Wesco Policy Declarations Page and its incorporation by reference into the Prior Knowledge/Litigation Exclusion set out above. That language, giving rise to coverage for claims already made after 9/14/2012 for example, is irreconcilable with the blanket position taken by AmTrust in the Denial Letter that a Claim made before 9/14/2016 (beginning policy period of the Wesco Policy) will "preclude coverage." In addition, the Past Acts Exclusion quoted above addresses the same concept of a previously asserted claim related to Interrelated Wrongful Acts, and yet the Plaintiffs and Defendant agreed to modify the Wesco Policy by virtue of Item 5(b) by not inserting a retroactive coverage date and, therefore, not setting forth a cut-off date for previous matters.  AmTrust cannot reconcile specifically negotiating away a retroactive coverage date with the position it took in its Denial Letter that Interrelated Wrongful Acts related to a matter asserted before September 14, 2016 would be excluded under the Wesco Policy.

40.     AmTrust's denial of coverage under the Wesco Policy has breached its contractual obligations, based upon the facts and the Wesco Policy language.

14

## COUNT I – BREACH OF WRITTEN CONTRACT
### (Negotiated and Type-Written Language of the Policy Provides Coverage Despite the Boilerplate Language Relied Upon by AmTrust to Deny Coverage)

41.     Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraph Nos. 1 through 40 above.

42.     As described above, and specifically at Paragraph Nos. 29-39, AmTrust owes coverage under the Wesco Policy for the Puff Petition and costs incurred in defending that Petition, notwithstanding the language of interrelated wrongful acts and interrelated claims relied upon by AmTrust to deny coverage.

43.     AmTrust's denial breached its contractual obligations under the Wesco Policy.

44.     Plaintiffs have incurred Loss resulting from the Claim for Wrongful Acts alleged in the Puff Petition.

45.     Wesco and AmTrust refused, and continue to refuse, to pay the Loss incurred by Plaintiffs resulting from the Claim alleged in the Puff Petition.

46.     As a result, Wesco and AmTrust breached their duties under the Wesco Policy to provide coverage to Plaintiffs for the Puff Petition.

47.     AmTrust and Wesco's conduct has proximately resulted in damage to Plaintiffs.

WHEREFORE, Plaintiffs Farmers Savings Bank, Mark White, and Michael Funke pray for a judgment against Defendants in an amount that will fully compensate Plaintiffs for their damages at law, together with interest thereon as provided by law and for the costs of this action, and such other relief as this court may deem just and appropriate.

15

## COUNT II – BREACH OF WRITTEN CONTRACT
### (The Puff Petition and the Puff Letter are not Claims for Interrelated Wrongful Acts)

48.    Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraph Nos. 1 through 47 above.

49.    AmTrust's denial of coverage under the Wesco Policy for the Puff Petition is based on AmTrust's position that the Puff Letter and the Puff Petition each constitute a "Claim" against Plaintiffs and that both such Claims should be considered a single Claim due to Interrelated Wrongful Acts purportedly alleged in both Claims.

50.    AmTrust's denial of coverage constitutes a breach of its contractual obligations to Plaintiffs, including, by its mischaracterization, its denial of coverage of the general statements in the Puff Letter's Claim for Wrongful Acts.

51.    The Puff Letter may suggest that actions taken by Plaintiffs were somehow inappropriate, but it fails to actually identify any misstatement, misleading statement, error or omission, or neglect or breach of duty by any Plaintiff.

52.    Even if the Puff Letter constitutes a Claim, which Plaintiffs dispute, the Puff Letter fails to allege a Wrongful Act. As such, the Puff Letter does not contain any Wrongful Act to which the Wrongful Acts alleged in the Puff Petition can interrelate. In other words, the Puff Letter and the Puff Petition do not satisfy the definition of Interrelated Wrongful Acts, which means the Claim made by the Puff Petition was timely reported by Plaintiffs under the Wesco Policy.

53.    The Puff Letter states that:

"This letter specifically outlines the following potentially unlawful patterns and/or practices with respect to FSB's handling of Ms. Puff's credit:

16

- Deceptive acts and omissions under the FTC Act Section 5,
- Lending fraud and insider abuse subjecting the FDIC deposit insurance fund to risk of loss,
- Unsafe and unsound lending practices subjecting the FDIC deposit insurance fund to risk of loss, and
- Patterns of discriminatory practices under the Equal Credit Opportunity Act."

AmTrust cannot interpret the Puff Letter to seek relief different from Puff's own characterization of her demand for relief. As to her first bullet point, FTC Act Section 5 contains no private right of action and as such cannot be a Claim by Puff. Similarly, the second and third bullet points assert that the FDIC may suffer in some fashion, but again makes no suggestion of a Claim by Puff. Finally, the fourth bullet point can be interpreted as making a Claim by Puff. However, she did not assert that same allegation in any way in the Puff Petition and as such it cannot serve as an Interrelated Wrongful Act between what is alleged in the Puff Letter and the Puff Petition.

54.     Even the Puff Letter's reference to discriminatory practices should not be interpreted as having made a Claim, because Puff only sought restitution. Restitution does not represent a demand for monetary damages or non-monetary relief, as required to meet the definition of Claim under the Wesco Policy.

55.     The Puff Letter does not make a demand for monetary or non-monetary relief. It seeks (at Page 6): (1) files, (2) document preservation, and (3) a meeting with FSB to discuss restitution, prior to "further action" being taken. None of those requests rise to the level of being a "written demand . . . for monetary damages or nonmonetary relief", as needed to qualify as a Claim under the Wesco Policy.

56.     To the extent that the last bullet point of the Puff Letter may be considered as making a demand, any such demand is for equitable relief in the form of restitution. Restitution does not constitute monetary damages.

17

57.     Restitution is an equitable remedy providing the restoration of property or rights or returning a party to its original state. An award of restitution does not constitute an award of monetary damages or nonmonetary relief.

58.     Even the language of the Wesco Policy distinguishes between damages and restitution. The definition of Loss contained in the Wesco Policy clearly states that damages constitute Loss while restitution does not constitute Loss.

59.     The last bullet point of the Puff Letter seeks restitution, not damages. As a result, the Puff Letter is not a Claim.

60.     The Puff Petition clearly alleges a Claim for Wrongful Acts that was first made during the Wesco Policy Period and reported by Plaintiffs during the Wesco Policy Period.

WHEREFORE, Plaintiffs Farmers Savings Bank, Mark White, and Michael Funke pray for a judgment against Defendants in an amount that will fully compensate Plaintiffs for their damages at law, together with interest thereon as provided by law and for the costs of this action, and such other relief as this court may deem just and appropriate.

### COUNT III – BREACH OF WRITTEN CONTRACT
**(The Puff Petition's Allegations of Breach of Iowa Code Section 654A.6 were Entirely New and Unrelated to Any Discussion in the Puff Letter)**

61.     Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraph Nos. 1 through 60 above.

62.     Counts I and II of the Puff Petition allege violations of Iowa Code Section 654A.6. As discussed below, that represents an entirely new and distinct legal theory, having no common nexus to anything alleged in the Puff Letter and, therefore, cannot serve as an Interrelated Wrongful Act.

18

63.　As a matter of substantive law, the allegations in the Puff Petition, at Counts I and II, of a statutory violation are entirely distinct legally from any allegations made in the Puff Letter. Counts I and II also relate to assertions of factual events that occurred after anything discussed in the Puff Letter. The Puff Letter sets out at pp. 2-5 a detailed chronology of the events complained of, concluding with the last event specified, alleged to have taken place June 21, 2013. By contrast, Paragraph Nos. 40 - 42 of the Puff Petition describe events taking place between June 24, 2013 and July 18, 2013 that form the basis of her Count I and rely upon events entirely distinct from those set forth in the Puff Letter. Those subsequent events are those that then form the basis at Paragraph Nos. 43 - 47, for the statutory violations asserted in the Puff Petition at Count I.

64.　Just as with the discussion above, the Puff Petition at Paragraph Nos. 49 and 50 - 53 allege discreet events not discussed in the Puff Letter, and it is those events that form the allegations of statutory violations set out at Paragraph Nos. 50, 54 and 55 - 57 of the Puff Petition and that underpin Count II's allegations of violation of Iowa Code Section 654A.6.

65.　Defendants, as insurers, cannot broaden Puff's demands, or facts that she chose to complain of in the Puff Letter, beyond the scope of what Puff herself chose to complain of.

66.　Given that the Puff Letter is dated August 29, 2016, Puff was aware of the lack of an agricultural mediation, and aware of the specific events on those dates as described in the Puff Petition's paragraphs noted above, and chose not to include in the Puff Letter either a reference to those dates of factual events, or reference to Iowa Code Chapter 654A, agricultural mediation, or any other reference to the factual underpinnings or legal theories that relate to Counts I and II of the Puff Petition.

67.　Given that the same attorney wrote the Puff Letter and filed the Puff Petition, it would be entirely inappropriate and a clear breach of contract for Defendants, as insurers, to read

19

into the Puff Letter a common nexus of fact or law to the subsequent Puff Petition, as it relates to claims of a violation of Iowa Code Chapter 654A, where Puff herself, through the same counsel, chose not to assert those facts or legal elements regarding that purported statutory violation, in her own letter. Again, an insurer cannot broaden a complaining party's letter beyond the scope that that complaining party chose to allege.

68.     The Puff Petition contains entirely new allegations that were not raised in the Puff Letter. The Puff Petition alleges violations of Iowa Code Section 654A.6. Iowa Code Section 654A.6(1)(a) requires that a creditor seeking to enforce a debt against agricultural real estate shall file a request for mediation with the farm mediation service. Pursuant to Section 654A.6(1)(a), a creditor shall not attempt to collect the debt until the creditor receives a mediation release, which is an agreement signed by all parties regarding the debt. The Puff Letter makes no reference to Plaintiffs attempting to enforce a debt against agricultural real estate without obtaining a mediation release. The Puff Letter, similarly, makes no reference to Iowa Code Section 654A.6(1)(a). The first and only time Puff alleges that Plaintiffs violated Section 654A.6 is in the Puff Petition.

69.     The Puff Letter makes no allegation of a purported Wrongful Act that can be considered to have a common nexus with a fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions related to the entirely new and factually and legally distinct allegation of Plaintiffs attempting to enforce a debt against agricultural real estate without obtaining a mediation release ("Agricultural Mediation Release Wrongful Act"). The Agricultural Mediation Release Wrongful Act is first alleged in the Puff Petition.

70.     As a result, the Agricultural Mediation Release Wrongful Act and the purported Wrongful Acts arguably alleged in the Puff Letter do not satisfy the definition of Interrelated

20

Wrongful Acts contained in the Wesco Policy, which means the Claim made by the Puff Petition was timely reported by Plaintiffs during the Wesco Policy Period.

71.   The Puff Petition clearly alleges a Claim for Wrongful Acts that was first made during the Wesco Policy Period and reported by Plaintiffs during the Wesco Policy Period.

72.   Plaintiffs have incurred Loss resulting from the Claim for Wrongful Acts alleged in the Puff Petition.

73.   Wesco and AmTrust refused, and continue to refuse, to pay the Loss incurred by Plaintiffs resulting from the Claim alleged in the Puff Petition.

74.   As a result, Wesco and AmTrust breached their duties under the Wesco Policy to provide coverage to Plaintiffs for the Puff Petition.

75.   AmTrust and Wesco's conduct has proximately resulted in damage to Plaintiffs.

WHEREFORE, Plaintiffs Farmers Savings Bank, Mark White, and Michael Funke pray for a judgment against Defendants in an amount that will fully compensate Plaintiffs for their damages at law, together with interest thereon as provided by law and for the costs of this action, and such other relief as this court may deem just and appropriate.

## COUNT IV – BREACH OF WRITTEN CONTRACT
### (The Puff Letter Makes no Claim against White or Funke)

76.   Plaintiffs reallege and incorporate by this reference the allegations contained in Paragraph Nos. 1 through 75 above.

77.   AmTrust's denial of coverage under the Wesco Policy for the Puff Petition is based on AmTrust's position that the Puff Letter and the Puff Petition each constitute a Claim against Plaintiffs and that both such Claims should be considered a single Claim due to Interrelated Wrongful Acts purportedly alleged in both Claims.

21

78.    AmTrust's denial of coverage breached its contractual obligations, including by failing to recognize that the Puff Letter does not constitute a Claim against White or Funke.

79.    The Insuring Agreements of the Wesco Policy clearly distinguish between the coverage provided for the Company and for Insured Persons. The coverage afforded by the Wesco Policy for White and Funke as Insured Persons is separate from the coverage afforded by the Wesco Policy for FSB as the Company.

80.    Even if the Puff Letter constitutes a Claim against FSB, which Plaintiffs dispute, the Puff Letter does not constitute a Claim against White or Funke. To the extent the Puff Letter may be considered as making a demand for monetary damages against FSB, nothing in the Puff Letter can be read as making a demand of any kind, for monetary damages or otherwise, against White or Funke.

81.    The Wesco Policy clearly distinguishes between Claims against Insured Persons, such as Plaintiffs, White and Funke, and Claims against the Company, FSB.

82.    The Puff Letter makes no Claim for alleged Wrongful Acts against White. While the Puff Letter is addressed to White as the intended recipient of it as President of FSB, his name does not appear again in the letter. None of the conduct complained of in the letter is attributed to White. Of the three things requested in the Puff Letter (p. 6)[3], none expressly, or even impliedly, constitute a "a written demand . . . for monetary damages or nonmonetary relief" from White himself. As a result, the Puff Letter cannot be deemed a Claim for alleged Wrongful Acts against White himself.

83.    The Puff Letter makes no Claim for alleged Wrongful Acts against Funke. The Puff Letter is not even addressed to Funke, and, therefore, cannot be deemed a demand against Funke.

---

[3] (1) Puff's files, (2) document preservation, and (3) a meeting with FSB to discuss restitution.

22

Additionally, of the three requests made in the Puff Letter, none are a "written demand . . . for monetary damages or nonmonetary relief" from Funke himself. The request by Puff for her records does not qualify as such, the request for preservation of Funke's records related to Puff is not a demand for damages or "relief", and the request for a meeting to discuss restitution is limited to being with FSB with no suggestion any such restitution was requested from Funke himself.

84.    Given that the Puff Letter does not state a Claim against Plaintiffs White and Funke, AmTrust's determination that the Interrelated Wrongful Acts definition is satisfied as to Plaintiffs White and Funke by the Puff Letter and the Puff Petition is patently wrong. Whether any Wrongful Acts alleged in the Puff Petition share a common nexus with any purported Wrongful Acts arguably alleged in the Puff Letter has no bearing on any coverage provided to Plaintiffs White and Funke by the Wesco Policy, because the Puff Letter is not a Claim against Plaintiffs White or Funke.

85.    The Puff Petition clearly alleges a Claim for Wrongful Acts that was first made against Plaintiffs White and Funke during the Wesco Policy Period and reported by Plaintiffs during the Wesco Policy Period.

86.    Plaintiffs have incurred Loss resulting from the Puff Petition.

87.    Wesco and AmTrust refused, and continue to refuse, to pay the Loss incurred by Plaintiffs resulting from the Claim alleged in the Puff Petition.

88.    As a result, Wesco and AmTrust breached their duties under the Wesco Policy to provide coverage to Plaintiffs White and Funke for the Puff Petition.

89.    AmTrust's and Wesco's conduct has proximately resulted in damage to Plaintiffs White and Funke.

23

WHEREFORE, Plaintiffs pray for a judgment against Defendants in an amount that will fully compensate Plaintiffs for their damages at law, together with interest thereon as provided by law and for the costs of this action, and such other relief as this court may deem just and appropriate.

Respectfully submitted,


_____*/s/ Matthew L. Preston*_____
Matthew L. Preston, PIN: AT0006314
Cara L. Roberts, PIN: AT0012362
**BRADY PRESTON GRONLUND PC**
2735 1st Avenue SE
Cedar Rapids, IA 52402
Phone: 319/866-9277
Fax: 319/866-9280
MPreston@BPGLegal.com
CRoberts@BPGLegal.com

**ATTORNEYS FOR PLAINTIFFS**

24